The United States Court of Appeals for the Ninth Circuit is now in session. Good afternoon. Aloha, and welcome to our renewed session of the Ninth Circuit. I want to especially thank Council for their indulgence. The best laid plans of mice and men here in terms of our timing did not go exactly as we had planned. So thank you very much for your standing by, and we apologize for any inconvenience that the delay caused you. We are here to hear the case of Twitter, Inc. v. Paxton, the Attorney General of Texas. I have this as 20 minutes for each side. I welcome my colleagues, Judge Nelson and Judge Bumate. And I believe that Mr. Niemann, am I pronouncing your name correctly? Oh, thank you so much for asking, Your Honor. It's pronounced Niemann. All right, Mr. Niemann, you go first and whenever you're ready. Thank you, Your Honor, and may it please the Court, I'm Peter Niemann on behalf of Twitter. I'd like to reserve two minutes for rebuttal. Last January, Twitter made what was a controversial decision, but a First Amendment protected decision, not to carry certain speech on its platform. Within days, the Attorney General vowed that as Attorney General, he would fight Twitter with, quote, all I've got. He announced that he was launching an investigation of Twitter. He served Twitter with a CID demanding sensitive internal editorial policies. And he stated publicly that his investigation was driven by Twitter's decision not to carry the speech in question. It's Twitter's submission that these actions were unlawful retaliation. Now, as the Supreme Court has explained in Hartman, the First Amendment prohibits government officials from subjecting the individual to retaliatory actions for exercising their First Amendment rights. And the district court here said that Twitter had brought suit too soon. But our submission is that the whole point of retaliation and the whole reason that retaliation is unlawful is because it pressures you into changing your speech. And that unlawful pressure begins as soon as the retaliation occurs. Here, the retaliatory threat, the investigation, the CID put Twitter under immediate pressure to change the moderation decisions that it makes every day. Along those lines, and maybe you're about to get to that. What I didn't see in Twitter's complaint was an allegation of where Twitter's speech had actually been chilled. A lot of allegations that, as you're saying, there's pressure, scrutiny. But can you point to a concrete example of where Twitter has changed its moderation practices in response to the complaint or the CID? Your Honor, it's not our contention that Twitter has changed its moderation practices, and it's not our burden to show that it has. If you look at a case like Brodheim or a case like White v. Lee or a case like Lacey, all of which we cited in our briefs. Those are all cases in which there were threats applied, where an investigation was launched in retaliation for First Amendment activity. And in all three of those cases, the plaintiff continued with their First Amendment protected conduct. But this court nonetheless found that they had stated a First Amendment claim appropriately. Because the idea here is that we have to show conduct that's severe enough to chill a person of reasonable firmness. But this court has said over and over again. Counsel, I'm trying to look for a limiting ripeness principle. Attorneys General do a lot of information gathering. So let's say there were a hypothetical of, say, an attorney general from, let's say, California, who thought that a company in Texas was overcharging a California consumer and sent a CID to Texas about the overcharge. And the Texas entity said, you know, we're a really big supporter of former President Obama or we're a really big supporter of former President Trump. And we donate to them and we back what they've done. And the attorney general of California has publicly decried anyone who supports either of these two individuals. And while this purports to be asking us if we overcharged Miss Smith or Miss Doe in violation of the UDAP statute, it's really in retaliation for our political views. And we're doing in Texas to enjoin it. Is that is that indistinguishable? I don't think it is, Your Honor. And I fully appreciate that the court does not want to do something that will open the floodgates and make every subpoena that's ever issued by a by an attorney general the subject of a challenge on First Amendment grounds in some foreign jurisdiction. I understand that concern. I want to focus on a couple of things that I think make this quite different. I think the allegation of retaliation here is unusually specific and powerful. Right. This is not just generally, you know, the kind of company has engaged in certain kind of conduct. And generally, the attorney general has said certain things. What we've alleged here, using the attorney general's own words, is that this was a subpoena issued specifically to retaliate for our speech. And there's several features of it that support it, not just that the attorney general himself said so. Well, hold on a second. I don't want to take away from your characterization. I understand that's how Twitter sees it. And maybe that's the allegations we have to take at this time. But there's also some suggestion. I mean, the attorney general has also said that, you know, he was investigating Twitter long before this happened. This was sort of the proverbial straw that, you know, broke the camel's back. And then he also said, you know, it's not clear we're going to proceed, but we wanted to get the CID out there. But we have no immediate plans to enforce it. So how do you deal with those facts? Well, again, I think a couple of points that I would make, Judge Nelson, in response to that. I mean, first of all, we're talking about whether we've stated a claim here. And our allegations, I think, do need to be assumed to be true as long as they're plausible. And I think we meet plausibility easily here, given the timing and the content of the attorney general's statements. So that's the first point. Second, I think it's also worth noting that the kind of alternative investigation that has been hypothesized in the briefing, but, of course, doesn't isn't part of considering the adequacy of our complaint, is itself a kind of investigation that is pretty suspect. Right. I mean, news organizations and media platforms all the time make general statements about how neutral they are and how fair they are, how fair and balanced do they put all the news that's fit to print and the like. And I think it would be pretty troubling if those kind of general statements paved the way for law enforcement, whenever they're not happy with their coverage, to say, oh, I'm not accusing you. I'm not investigating you for your negative coverage of me. I'm investigating you because you've told people that you're neutral, but your negative coverage of me shows that you're not. That would be a pretty troubling idea to endorse. And that's the alternative investigation the attorney general claims is really going on. And it's particularly an unlikely alternative investigation here where we're talking about a product that's free. And so the idea that there could be a sort of consumer protection investigation about our claims of neutrality with regard to a product that's free. It's a pretty unlikely. Well, yeah, you say you say Facebook's free. And yet, you know, Facebook's obviously making a lot of money by attracting consumers there. And so, I mean, certainly if certainly the allegation seems to be that if the truth were known, whatever that may be, that you would have less less individuals on the platform. So there does seem to be something to that. I wanted to go back to your Brodheim examples, because to me, those cases dealt with seem to be on the merits of whether you can state a claim. Article three standing seems to be quite a different analysis. I haven't seen this. Your objective person brought into the standing analysis. And can you give me other examples where that's happened? Because it seems to me injury, in fact, which is an Article three threshold, means just that the plaintiff has to actually have an injury, not just that a normal, objective plaintiff in that position would feel an injury. So how do you square those? I quite agree. Your Honor, we have to show an injury. The question is, what is the injury? And the injury is having pressure placed on our free freedom to make our own moderation decisions sort of unfettered from government pressure. That that's our submission here. And look, I mean, if you look at a case like Brodheim or a case like White v. You're quite right. They don't discuss rightness in standing there. But the plaintiffs in those cases didn't change their behavior. And this court said not only that they had stated a case, but they had stated a winning case. And it's hard for me to understand how we could be required to plead more to get into court than we would need to plead in order to win. And so I think the sort of way out of that box is to conceptualize what what's the harm here. The harm is brought him talks about it. It's the apprehension that is created by the threat. And I think that fits well here also. That is to say, it's not that we have to show we've changed our behavior, but that we've been placed under a lot of pressure. That's the injury having. But if you resist the pressure, what's the injury? Well, I think the same that that's exactly how the government defended in Brodheim, Your Honor. They said, look, this guy kept fighting. You know, he says we we threatened him in there about to be more careful in making, you know, complaints, grievances in jail. And there was a whole sort of loss litigation in the lawsuit about whether he really changed his behavior or not. And what the Ninth Circuit said is, look, that's not the question. And there's a whole series of these cases saying that's not the question. It's not just brought on. This is a well established. The one thing I'm confused about, though, in your briefing, you seem to suggest that Twitter has already been injured. So, like, I'm looking at page 12 of the reply brief. Twitter has already suffered a chill on its First Amendment protected editorial judgments. But now you're saying there's there's nothing to support that. No, if I've conveyed that impression, Your Honor, I've led you astray and I apologize. The way the court has talked about chill is they've said you have to show that you are chilled or silenced. OK, those are not the same thing. In other words, a chill isn't that you've changed. The chill is that you've been subjected to pressure that would lead a reasonable person to change. And that's the distinction that I think the cases have drawn and that we're relying on here. I mean, it's not something we're inventing for purposes of this case, but that's that's the only way you can kind of reconcile the fact that you've got all of these cases. Counsel, one of the one of the one of the things your complaint says is you want to enjoin the CID and you want to enjoin. And I quote, if I'm looking at the right complaint, paragraph 67 further, you want to enjoin the attorney general from furthering its investigation into Twitter. So would would your complaint be viable if what we had is the attorney general not sending a CID, but saying I'm going to investigate Twitter because you've asked to enjoin the attorney general from his investigation? And you could say that, well, him saying he's going to do an investigation is chilling us. So you federal court enjoin him from investigating us? Is it would that would your claim be on exactly the same footing as you as you contend your current claim is? I think there had been no CID. I think from a rightness point of view, it would be. But I think we would you would still have the question of whether we've adequately alleged severe enough adverse action to chill a person of reasonable firmness. And the court might be of the view that more than just announcing the investigation was required for it to be sufficiently adverse. I would know, your honor, that it clearly can't be a requirement that there's actually resort to enforcement action, because if you think about a case like Bantam Books in the Supreme Court where what happens is they just write the guy a letter saying, oh, well, I'm sorry. I'm sorry, counsel, but Bantam Books, there was a lot more going on in Connecticut, if I'm remembering the state correctly, than just writing, writing a letter. There was a lot of positive action to make sure these booksellers were not selling what this state commission thought were obscene books, not just writing a letter. Well, I think the actually in terms of what the interaction was between Bantam Books and I think it's Rhode Island, your honor. Oh, Rhode Island, you're right. Well, I went to college, so it's memorable for me. But I do think that that there's there's this whole state apparatus. You're right to kind of create the review process. But in terms of what the interaction is between the state and the victim of the retaliation, I think it's just a letter. And look, I think if you also look at a case we've cited in our briefs out of out of the Fifth Circuit, the Gray Wall case there, it is just a letter that's written. It's a it's a letter from the attorney general of New Jersey to somebody in Texas who is publishing on the Internet the way to make guns using a 3D printer. And and there the lawsuit is predicated on the cease and desist letter. Can I ask a question about personal jurisdiction? I know we got a lot of different issues here, but it's not intuitive to me. And maybe I'm I'm looking for the same limiting principle in that context that I think Judge Bennett's looking for in ripeness, that every attorney general is subject to personal jurisdiction when they send out a letter or even a letter that is claimed to cause First Amendment harm. And I guess the question is, is it the letter that's being directed into California that's causing the harm or is it the threat of the investigation? Because those could be analyzed separately. I mean, the threat of the investigation might occur in Texas. The letter might be injected into California. How do we delineate those? Yes. Let me tell you how we think about it, Your Honor, and see if this is helpful to you. I mean, we look at cases like Calder case from the Supreme Court, this court's decision in Myers and the Fifth Circuit's decision in Graywall. And there's sort of a unifying theme, I think, across all those cases, which is there's sort of the tort where a lot where where the tortfeasor is out of state and the victim is in state. And they all involve kind of what I would think of as sort of communicative ports. So in Myers, it's invasion of privacy. In Calder, it's libel. That's the Supreme Court case. And in Graywall, it's censorship. And there's an idea, I think, in all three of those cases, that those are the kinds of out-of-state conduct that are really directed not just at the victim, but at the victim community. Because in Graywall, it was the victim's community in Texas that would be deprived of the speech about how to download guns. And in Calder, it's the victim's community that would evaluate the libel. And in Myers, it's the victim's community that would be affected by the loss of privacy. That's where you feel loss of privacy in your community. And in all three of those cases, the court says, look, it doesn't matter whether or not the tortfeasor took some action in the state. It's that they directed their tort at the state. So the kind of tort in the state. So under that theory, then, the fact that the letter was, for example, if the attorney general had just posted or sent around on his Twitter feed a threat to go after Twitter but had not actually sent a letter into California, your position would be that would be enough to subject the attorney general to a jurisdiction in California because the harm of that threat was being felt in California. Is that correct? I would state it a little bit more as I would say the critical factors here are that the conduct he was retaliating against occurred in California. The conduct he was trying to influence on our theory, that is, our future moderation decisions were in California. And he communicated the threat to us and we received it in California. And that's my question is how much of a role does the letter play? Because you seem to be if he hadn't sent the letter to California, you seem to be willing to make the same arguments. I think we would make the same argument. Your Honor might have a different view of it, but I think we would make the same argument because I think if you look again at cases like Gray Wall, cases like Myers, at cases like Calder, the focus is not so much on, you know, does the defendant set foot in the jurisdiction? Does the defendant set a letter into the jurisdiction? But is this the kind of harm that we would think of as being directed at the jurisdiction? Counsel, does that framework work in the Internet era? I mean, to me, it seems like Twitter has sent, you know, flooded Texas with messages, which the attorney general claims were violates their consumer protection. And so he's responding to that flood of messages in Texas. And only by virtue of the fact that, you know, the physical people be on Twitter and are in California. But all the action as far as compassion is concerned is in Texas. Well, I don't really agree with that. I mean, I think, as I said, the decision that we made that he didn't like, we would say, was the removal of the speech from our platform. That's not a decision that just affected Texas. That's a national decision that we made in California. And the behavior he's trying to modify in the future is it's not like we have a Texas feed and we have a California feed. And I think in that respect, it's just like Gray Wall, Your Honor, because in Gray Wall, the court says, look, it's not that the attorney general in New Jersey was just trying to change whether New Jersey residents could get access to this information. He was putting on a cloak of national authority and trying to make this information unavailable nationally. And it's nothing unfair then in allowing him to be sued in Texas, where many people will be deprived of one question free run at a time. Assuming we accept your argument that the pressure is enough to have an injury back for Article three purposes. But since you're since you've been able to resist all all the pressure, why not as a prudential matter, just wait to see what happens? You know, if if Texas enforces the CID, then that's that will change things. If if Twitter finds that they actually are changing their their moderation policies, then that changes the matter from a prudential standpoint. Doesn't that make the most sense? I don't agree, Your Honor. And I know my time is almost out. So let me just say this very quickly. I mean, I think if you look at. Mr. Mr. Mr. Mr. Nyman, we'll give you some extra time. So so take the time to answer Judge Bumate's question and we'll also give Miss Pettit additional time if she needs it. I much appreciate that, Your Honor. Thank you. I mean, I would just say if you look at cases that we've cited, like Arizona Right to Life, California Pro-Life Council, cases like that. What the court says is that once First Amendment injury has actually been suffered from conduct that is directed at the defendant, that dispenses with any rightness concern and the case is necessarily right for review. And those constitutional rightness or prudential? Yes. Well, I think they're talking about both, Your Honor. And I think that if you think about a case like, you know, I would flip the prudential consideration around a little bit because I would say, look, a case like Elrod v. Burns says that being deprived of First Amendment rights even for a short amount of time is inherently irreparable harm. So on the prudential side, we are suffering as long as we are we are under this pressure. And on the other side, you have the attorney general who seems unable to articulate any way they're harmed by having this adjudicated. I mean, obviously, they'd like to win, but other than that, they're not. Judge Bennett, is it OK if I ask a follow up question? Of course. Of course. So it seems to me that to me on the prudential rightness discussion is the attorney general of Texas seems to be very much harmed because. And I'm worried about state sovereignty here where Texas is doing an investigation. Why shouldn't they have the expectation that that investigation is going to take place in their state? And I get that that's not inviolable, but that seems to be a pretty big harm when, you know, the whole point really what's going on here is a forum selection. At the end of the day, you could raise these same arguments in the state of Texas, but you've chosen to go into the Northern District of California instead. And I'm not sure why that doesn't harm Texas and their state sovereignty. Well, I make a couple of points, Your Honor, just dealing with the facts of this case. First of all, they've had seven months to continue with their investigation, which since the stay in the district court was lifted last May and they haven't as far as we can tell. And therefore, the claim that they're somehow being impaired from doing what they would otherwise want to do is a little bit harder to understand than it might be in another case. Didn't you just sort of weaken your rightness argument? They haven't gone forward. No, Your Honor. Not at all. I mean, I think our position on rightness is they're perfectly content to kind of leave the sword of Damocles hanging over our head, leave the pressure on us. But what's the sword? The fact that they've threatened to fight us with all they've got and that they've served us with a subpoena that they haven't withdrawn. The sword is the threat and the CID that they have not taken any steps to enforce. Sure. And you know, there's a bit of game playing going on here by the state. Right. I mean, the the the court in the district court, we you know, we initially work out a kind of a standstill. Then the district court rules and the district court says, look, I have personal jurisdiction. I have venue. But until they move to enforce, this isn't yet ripe. And so what they do is they just sit back and they don't do anything to enforce. Meanwhile, we're sitting here going, boy, this is by the way, this is a subpoena that on its face requires us to continue to supplement as new documents are created. So we're sitting there continuing to have to make decisions about moderation and write documents. You could go to Texas and have the CID quashed. Well, let me just challenge that just slightly, your honor. First of all, I don't think we could at this point go to Texas. I assume that the state attorney general would claim that actually until they move in Texas, we can't go to Texas. Because under the Texas procedure, as I understand it, there's a time when that would have to be done by that. That's long since I think their position would be a long since run. First of all, second of all, I just want to make the point that and I appreciate you've given me a lot of extra time. And thank you for that. I do want to make the point that that what we're seeking here, as some of you have noted, is broader than just a quash the subpoena. And therefore, the notion that we could get the same relief in a subpoena enforcement action in Texas, we don't think is correct because that wouldn't relieve us from the whole investigation that he threatened. One more point that I want to make. In regard to that, if if if the court will will quickly, quickly, as I think that that, you know, it's important as the court is thinking through this case to think through not just in the context of Twitter, but in the context of all the different kinds of people who this court's case law reflect. It's subjected to retaliatory conduct from the prisoner in in Brodheim, to the community newspaper in Lacey, to the community members who are protesting a development they didn't like in Whitefield. All of their rights are at stake here, too, in having the ability to go to court upon being retaliated against to seek to have that retaliation lifted. All right. Thank you, Mr. Nyman. We'll give you three minutes for rebuttal. Ms. Pettit, whenever you're ready. Thank you, Judge Bennett. And may it please the court, because the First Amendment is not a license to defraud. It does not give Twitter a free pass on a government investigation into whether they have committed fraud. That is precisely what the CID at the heart of this case seeks to do. And because that CID is not self-enforcing, both the district court and a motions panel of this court correctly held that it was not right under the rule created in Reisman, recognized in Zimmer and applied in Google. Can I ask you about can I ask you about Reisman? I mean, as you as you probably know, I was on the motions panel and at the time I thought Reisman was pretty persuasive. The problem I now see after I've considered Reisman more is that it doesn't deal with the First Amendment harm that's being alleged here. And so that seems to be that seems to put Reisman in a different category. Now, I know the Fifth Circuit in the hood case extrapolated Reisman to the First Amendment context. But it seems like Reisman doesn't really address this question, at least for constitutional rightness. So what how do we address that? Why do you think Reisman covers a First Amendment harm as opposed to just a normal subpoena issue? So two responses to that, Your Honor. First is a very specific one. That is that the case in Reisman did not involve a question of a First Amendment chill. But there was a question of chilled communication played under the Sixth Amendment, specifically communications with counsel. So those are analogous for the purposes of Reisman. Because returning in my broader response, returning to the question that you asked Mr. Niman about how this brought more broadly applies, because it is a bedrock principle of federal courts jurisdiction that you do need a concrete harm. And in the in the pre enforcement context, that concrete harm includes a genuine threat of imminent enforcement. And you see that in numerous First Amendment cases. And one that I think that is particularly responsive to a number of points Mr. Niman made is Laird against Tatum back from 1974, where the Supreme Court looked at the specific question of whether the mere existence of a government investigation and the concomitant fear that the information would lead to some sort of concrete action, which is directly analogous to Mr. Niman's points on whether or not the threat by itself outside the CID would be a right injury. The Supreme Court said it was not because it carried to and I'm looking at page 18 of that opinion carried to its logical conclusion. This approach would have the federal courts virtually continuing monitors of the wisdom of executive action. And that's not what the courts are designed to do. Now, Reisman also recognizes this, I believe, goes to Judge Bumate's point of prudential problem. And I guess it's actually better described in this court's decision in Zimmer, because all of the arguments that they are raising from a First Amendment perspective can be raised in the Texas state court. Now, Mr. Niman is correct that he can't move to quash at this point. But that's the result of his choice, his choice and his client's choice not to go to Texas. Under this court's ruling in Zimmer, he could have gone and raised the same argument. So would it would it make any difference to your right? Rightness argument. If the facts here were that Attorney General Paxton had announced, I don't like Twitter's speech. And I am sending this CID to them because I want them to change their speech. I want them to be politically more attuned to me. And maybe they'll get the message when they get my CID. Let's say they had alleged that Attorney General Paxton had made those statements. Would would the same claims they're making now be right? From a constitutional perspective, it's certainly much closer and it's possible from a prudential perspective. I do not think so, because under this, under the Fifth Circuit, as the Fifth Circuit explained in Google, if you specifically looking to footnote 10 of that opinion, because there is the intermediation of a third party, specifically a court there, it would be speculative. And you don't know how that's going to proceed because you cannot assume that Mississippi, in that instance, state courts and here Texas state courts will apply, the subpoena in a way that doesn't take care of the First Amendment considerations that you're that you're hypothetical raises. So it's still somewhat you still don't know, as a factual matter, that that's actually ever going to lead to a consequence. And while that sort of comment would certainly be inappropriate, it is not imposing any actual harm on Twitter beyond the CID. And no matter what the allegations are as to the motive of the enforcer, no matter how clear they are that they violate the First Amendment and no matter how big the CID is, there wouldn't be harm enough for there to be prudential ripeness without the actual move to enforce it in the state court. There's taking that step back. That's not that's not precisely what I mean, because there there might be additional steps. For example, the court in the white case that Mr. But there were a number of additional executive steps that went that went into place. That case, however, was not pre and was not considered pre enforcement because there had in fact been a number of for example, an interrogation there had been changes that had happened. So I'm simply saying on for if the only action that has been issued is a CID that actually has an effect on Twitter, then absent some enforcement in a state court, there is no prudential ripeness. There might be some other action that the attorney general is taking. But when it's just the CID, that's that is where it's a ripeness problem. So do you have a response to opposing counsel's argument that the pressure to change is the injury? In fact, it's and that's all they need to show that there's a pressure to change their moderation policies. So it could be under certain circumstances. But this goes back to what is a credible threat of enforcement in language of cases like Staple or in or in Susan B. Anthony list. And if the pressure is a non and self-enforcing CID that the Twitter can ignore without consequence, then we're back into the world of Laird against Tatum, where you're just aware, generally speaking, of a governmental investigation, which by itself is not is simply a subjective chill as opposed to an objectively reasonable one. So with this, would this be different if the attorney general had written a follow up letter and said, hey, we haven't heard anything. If we don't hear if we don't get your responses within the next two weeks, we're going to go in and enforce it. Would that be enough to to to make this case right? Possibly again, from the constitutional perspective. But because there is this additional forum, there is a prudential ripeness question because that I think the best way to sort of take a look at this is to take a step back and see what would happen if there was, in fact, an enforcement action taken. We would be in the world of Younger against Harris, where there would be an abstention doctrine that would prevent the federal courts from getting involved. And so what this particular ripeness rule, for example, in Reisman or Google prevents is sort of circumventing a limit on federal jurisdiction by suing too early when you don't really know what's going to happen. And as Mr. Nyman has pointed out, we haven't sought to enforce the CID. So to the extent that Twitter is still feeling a chill from an from a CID that it's not being enforced, I'm not sure what's causing it. If you have no intent to enforce it, why don't you withdraw the subpoena? So the answer to that question is something that has been discussed. But part of the reason that we haven't enforced it is there is, in fact, this new law in Texas called that goes by the name generally of HB 20 involving content moderation that has changed the legal landscape. We just haven't made a conclusion yet whether or not we're going to enforce it. But the fact that we haven't enforced it yet means that this is not an appropriate dispute for the federal courts to become involved because there's no article. Is it uncontested that if this does get challenged in Texas, that Twitter would be able to raise their First Amendment challenges in that in that in that forum? Yes, Your Honor, they would be able to raise their First Amendment challenges because a subpoena issued with an improper motive is not enforceable. And Texas courts are presumed to apply that correct to apply that with. But there's nothing. I mean, I know Texas has passed other laws where they've taken away certain defenses. There's nothing like that here where Twitter would if Twitter, if for some reason Texas law did take away a First Amendment defense in Texas, would that change the rightness analysis such that the case here might be right? So you've listed a number of hypotheticals. If you couldn't bring the First Amendment challenge and there's been a threat to actually go in force, then probably, yes, that would be right, because there's no alternative forum that they could raise that concern. Counsel, since we're talking about prudential considerations to sort of borrow a phrase from the civil contempt arena where it's said that somebody holds the keys to the jail cell in their own pocket. If Texas were to withdraw the subpoena and end all threat, the case on this isn't right would be much, much, much stronger. Why shouldn't we take that into account in our prudential analysis? The fact that the attorney general certainly has the right to withdraw the subpoena, but has chosen not to. So, Your Honor, I'm not sure that we do hold based on Mr. Nyman's representations today. Even if we were to take that hypothetical, we do hold the keys because he said that our investigation itself is what he would like to be suspended. And so we wouldn't be allowed to investigate compliance with our laws, even absent the CID under his claim. So that is a very broad statement that is effectively saying that the DTPA just doesn't apply to Twitter. And that is very concerning and goes into our analysis as to whether we should withdraw the subpoena. I heard I heard Mr. Nyman saying what he thought of the investigation. But that doesn't mean that's the same view the court would take as to prudential standing if Texas did decide to withdraw the subpoena. But you would agree that withdrawing the subpoena or not withdrawing the subpoena is at least a relevant fact in the prudential standing analysis? In prudential, perhaps. However, I would point out that a number of courts have not considered whether I've not said that the government's investigation that they've lawfully started had to be withdrawn to dismiss on the grounds of ripeness, including the the Reisman case itself, the court's case in Zimmer. The question is whether there was a credible threat of enforcement under the typical rules of ripeness, even as applied in the First Amendment. And without that, the threat of enforcing that non-self-enforcing CID, that there isn't actually a threat, a Article 3 standing or an Article 3 injury, regardless of whether the government stops its investigation. Now, turning to the, there were a couple of questions of personal jurisdiction, which are also sort of related to this because I don't remember who precisely asked this question about submitting ourselves to the personal jurisdiction of another court. And it's also submitting ourselves to the super superintendents of the federal court system simply by issuing an order. Or a letter, I apologize, I misspoke. If this is, if Your Honor is correct that from prudential concerns, we have to pull down our investigative request to either avoid the jurisdiction of a foreign state or to avoid the federal courts having the jurisdiction to enjoin it. We've moved to the point where we can't really enforce our laws against anyone because you would have basically jurisdiction, for example, in the state of Delaware for almost all American corporations. So we would be in a position- And that would go to prudential likeness, these arguments you're making now. Yes. Basically saying, yeah. Yes, Your Honor. And so if you're talking about a system that would shut down everything, then you've got a lot of concerns as to whether that really goes to a thing that the federal courts should be doing as opposed to whether it's something they can do. Sorry, do you have any position on- I mean, there's a lot of issues in this case. We've got rightness, which is both constitutional rightness, prudential rightness. We've got personal jurisdiction. Could we decide this on prudential rightness without addressing constitutional rightness or personal jurisdiction? Would case law allow that, in your opinion? Your Honor, yes, I think it would. A number of the cases that I've been talking about and that we cite in our briefs don't specify whether it's going to prudential or Article III rightness. I think it goes to both. But if the court wanted to decide it on a non-constitutional basis, I think you could. You could also, as mentioned, on the constitutional, on the personal jurisdiction point, the- I'm trying to think if there's- So, going to the personal jurisdiction on a number of cases that Mr. Nyman raised, I would point out that the personal jurisdiction question in Calder has since been clarified, in particular in Walden against Fiore, which sort of- in the Ford against Montana case, which both spoke in terms of reciprocity or in the language of this court in Schwarzenegger, which is directly contrary to a number of the statements I heard Mr. Nyman make, where you have to have an activity or occurrence that takes place in the forum state and is subject to the regulation of that state. That's directly from footnote six in Walden. So you need to identify, in the terms of Schwarzenegger, the volitional act here. And the volitional act here is an investigation by Texas over compliance with the law in Texas. And under cases like Stroman and Folkley, the Fifth Circuit would have held because- would have held that to not subject Texas to the jurisdiction of the foreign court, because as the Supreme Court recognized in Ford, there are two concerns that lay behind this reciprocity concern. One is fairness to the defendant. The other is the interstate federalism concerns and the relationship of the states vis-a-vis each other. And we go back to the point I made earlier, which is that if a state subjects itself to the jurisdiction of another state, simply by trying to investigate the law against a resident corporation, then the independence of the states is effectively over. And that's not what the specific personal jurisdiction jurisprudence that Mr. Nyman quotes was designed to do. So those are all of the points that I have to make. If the court has any further questions, I'm happy to answer. Otherwise, I'm happy to cede my time. I have none. Do either of my colleagues have any further questions? No. All right. Mr. Nyman, as I said, we'll give you three minutes for rebuttal. Thank you, Your Honor. I'd like to make three points. First, there's some suggestion that the presence of state remedies somehow makes this case not ripe on a prudential basis. I think that runs really hard against the whole current of 1983 jurisprudence, right? This is a 1983 action. It is settled law in a 1983 action that there is no requirement to exhaust state remedies. The presence of state remedies is entirely irrelevant to whether a federal 1983 action go forward because the whole point of Section 1983, this goes back to Monroe v. Pape and has been reaffirmed five times. Counsel, I'm sorry. Can you respond to the argument that pressure is not enough, but there has to be pressure plus a threat of imminent prosecution in order to get injury? Yeah, I don't think that's accurate. I don't think that fits with the white Lacey or Brodheim and the predicate. It does fit with our case, safer chemicals versus healthy farms. Sorry. Safer chemicals and healthy families versus EPA. I can see that's not a First Amendment case, but it does seem to make some sense because if all you have is a statement by the attorney general not backed up by any action, then you're just speech versus speech at that point. Well, it's not speech versus speech here, Your Honor. We have action by the attorney general, right? It's a threat, an investigation, and a CID, so it's much more than that. And I just want to quickly respond to the sort of Laird v. Tatum point that was made that I think is also lingering around the edges of Your Honor's questions, which is that Laird v. Tatum and sort of that line of cases, which are sort of subjective chill cases, involve situations where there's no conduct directed at the defendant, right? Laird v. Tatum is just the mere existence of a power. And the court says, look, that's not enough to create a real controversy. That's not what we have here. We have the power directed at us. And I think the First Amendment is an important distinction, Your Honor, here that runs throughout the First Amendment jurisprudence, not only of this court but of the Supreme Court, that we care a lot about not deterring people from exercising their First Amendment rights. And therefore, we have a broader conception of rightness than we do outside of the First Amendment context, and that's an important distinction here. But, look, on prudential rightness, I think this really comes back to that same 1983 point, right? I don't think it's an appropriate consideration on prudential rightness to say, well, you could seek review in the state court. When Congress passed these amendments in the wake of the Civil War, the whole point was to give people access to a federal forum when their federal constitutional rights were in jeopardy and not require them to go first to a state forum. The Supreme Court has reinforced that idea repeatedly. Well, but not in the rightness context. I think that's what's different here is the question is, at what point do your claims become ripe? And that seems to be what's missing from those 1983 cases that you're discussing. Yeah, and just very respectfully, Your Honor, I think that the central thrust in the First Amendment context is it becomes ripe when we've been injured. And we've been injured here because we've been subjected to unlawful pressure. All right. Thank you. We thank counsel for their very helpful arguments. And the case just argued will be submitted. With that, the court is adjourned for this session and for today. This court for this session stands adjourned.
judges: BENNETT, NELSON, BUMATAY